IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>QUIRON ELLIS GREENE<br><br>Defendant. | **UNDER SEAL**<br><br>Case No. 1:26-mj-441 |

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Brad Workman, a Postal Inspector with the United States Postal Inspection Service, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I submit this Affidavit in support of a Criminal Complaint and Arrest Warrant for **QUIRON GREENE ("GREENE")**. As set forth herein, I submit there is probable cause to believe that on or about November 4, 2025, in the Eastern District of Virginia, **GREENE** did assault a United States Postal Service ("USPS") mail carrier, a person having lawful charge, custody and control of United States mail matter, money, and other property of the United States, with the intent to rob, steal, and purloin said other property of the United States, namely a USPS arrow key, in violation of 18 U.S.C. § 2114(a) and § 2. WEF

2. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS"). I have been a Postal Inspector since July 2024 and am currently assigned to the Washington Division Northern Virginia domicile, located in Fairfax County, Virginia. As a Postal Inspector, I investigate violent crimes committed against USPS employees, including violations of 18, United

States Code, Sections 2114(a) (theft by robbery of mail, money, or other property of United States), 111(b) (assaulting, resisting, or impeding certain officers or employees), 1951(a) (interference with commerce by threats or violence), and 371 (conspiracy to steal and possess stolen U.S. mail). More generally, my duties also include investigating theft of U.S. Mail, mail fraud, identity theft, access device fraud, wire fraud, and bank fraud.

3. I have completed the Criminal Investigation Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and received specialized training in the investigation of violations against the Unites States Postal Service. Prior to my current assignment, from July 2024 through April 2026, I was assigned to conduct narcotics and other contraband investigations pertaining to violation of United States Code. In that capacity, I received training in the identification of controlled substances, field testing, undercover investigations, telecommunications analysis, surveillance techniques and financial investigations. Prior to my current employment, I worked as a Special Agent for the Department of Army, Criminal Investigations Division. In that role, I investigated complex fraud schemes involving contractual agreements with the U.S. Government and its personnel.

4. Based on my training and experience as a Postal Inspector, I know that universal master keys, also known as arrow keys, are issued to postal carriers to access collection boxes, community mailboxes, apartment mail receptacles, and parcel lockers. I know that arrow keys are targeted by criminal organizations that attempt to engage in mail theft to further their criminal schemes. I know that the theft of USPS arrow keys frequently facilitates widespread mail theft and is commonly associated with other related crimes, such as check fraud, identity theft, and financial crimes.

5. I know that when community mailboxes and USPS collection boxes are illegally accessed by criminals, it is often with the use of an arrow key. Community mailboxes are

standalone multiple unit mailboxes, containing eight to sixteen individual customer compartments that are accessible through a single-entry point by a postal employee, typically a letter carrier. This access is gained by the letter carrier using the master arrow key. Each customer compartment is accessed by the customer through an individually locked door, to which the customer maintains access to their individual door. Community mailboxes are commonly placed in apartment buildings and housing developments to allow a single point of delivery for the USPS.

6. Similarly, USPS collection boxes and mailboxes are commonly placed in residential and commercial areas to allow a single collection point for mail carriers to collect outgoing mail. From my training and experience investigating mail theft, I know that mail theft from community mailboxes and USPS collection boxes, with no sign of damage, indicates the use of a counterfeit or stolen arrow key. I also know, through my training and experience, that arrow keys have a real value of approximately $100, but an estimated resale "street value" of $5,000.

7. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement.

8. The facts and information contained in this Affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during this investigation.

9. Because this Affidavit is submitted for the limited purpose of obtaining a Criminal Complaint and Arrest Warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the Criminal Complaint and Arrest Warrant.

## PROBABLE CAUSE

10. On or about November 4, 2025, City of Fairfax police officers and USPS Inspectors responded to a gunpoint robbery that occurred in the vicinity of 3981 Wilcoxson Drive, Fairfax, Virginia, in the Eastern District of Virginia. The victim ("V-1"), a USPS mail carrier, informed law enforcement that V-1 was approached by two unknown male subjects while V-1 was delivering mail. One of the subjects, later identified as **Uncharged Co-Conspirator 1 ("UCC-1")**, brandished a handgun and pointed it at V-1. V-1 described the handgun as being "camo" colored. **UCC-1** then grabbed the USPS arrow key from V-1's belt loop, breaking the belt loop in the process. **UCC-1** and the other subject, later identified as **GREENE**, fled on foot and entered a light-colored Chevrolet Impala that was located nearby.

11. **UCC-1** entered the vehicle's front passenger seat, while **GREENE** entered the rear driver's side seat. The vehicle, driven by a third subject, later identified as **Uncharged Co-Conspirator 2 ("UCC-2")**, then fled the area. V-1, using V-1's cellphone, took a photograph of **UCC-1** and **GREENE** as they entered the Chevrolet Impala prior to fleeing the scene. V-1 took the photograph at approximately 2:43PM.



*Photograph taken by V-1 showing **UCC-1** and **GREENE** entering the Impala*

## *IDENTIFICATION OF QUIRON GREENE*

12. In the days following the robbery, USPS distributed a reward poster to the community requesting information related to the robbery. The reward poster depicted the above photograph that was taken by V-1. In response to the reward poster, a concerned citizen ("CC") contacted law enforcement and provided information relating to the robbery.

13. On or about June 5, 2026, I interviewed CC, who stated that CC believed that **GREENE** was one of the subjects involved in the robbery that occurred on or about November 4, 2025. CC stated that CC communicated with **GREENE** via **GREENE's** cellphone number, ending in -1886. CC provided investigators with screenshots of text messages exchanged between **GREENE** and CC, which are dated on or about November 4, 2025. In the messages, **GREENE** stated that he went on a "drill money move" and explained that he had to "take something that belongs to somebody else." **GREENE's** messages indicated that he did not act alone. **GREENE** described his actions to CC as "scary but we made it back safe." **GREENE** also referenced "scamming doing checks" and mentioned "it was wild…I was the getaway driver…in VA." Furthermore, **GREENE** stated, "Once checks and allat(sic) come money gonna come in for me this week or next he gonna give me sum(sic)." Based on training and experience, I know that individuals who engage in check fraud, commonly referred to as "scamming checks," are often involved in the theft of mail, including the theft of checks from the U.S. mail stream.

14. Based on the content of these text messages, investigators determined that **GREENE** participated in the robbery. I know from training, knowledge, and experience, that individuals engaged in criminal activity commonly use vague or coded slang terminology when discussing illegal acts in text message communications to avoid detection by law enforcement.

15. On or about January 27, 2026, state investigators executed a search and seizure

warrant for AT&T historic Call Detail Records ("CDR") and cell site location information regarding **GREENE's** cellphone number. The information provided by AT&T revealed that an Apple iPhone 14 with an IMEI #35607112342890, IMSI #310280166467298, and associated with **GREENE's** cellphone number was in the immediate area of Latitude 38°50'37.2"N and Longitude 77°16'48.9"W at approximately 2:37PM on the day of the robbery. According to open-source mapping, these coordinates are .03 miles from the scene of the robbery, which occurred approximately six minutes later at 2:43PM.

*GREENE'S STATEMENT AND IDENTIFICATION OF ACCOMPLICES*

16. On or about May 18, 2026, investigators learned that the Baltimore County Police Department ("BCPD") arrested **GREENE** for an outstanding warrant on or about May 15, 2026, for charges related to Aggravated Assault. On or about July 13, 2026, myself and another investigator interviewed **GREENE** at the Harford County Detention Center in Bel Air, Maryland. Investigators advised **GREENE** of his *Miranda* rights, which he waived. Investigators explained that the purpose of the interview was to discuss a November 4, 2025, robbery in Fairfax, Virginia. **GREENE** stated, "I was there" and "I didn't have the gun or anything, but I was there." **GREENE** stated that **UCC-1** pulled out the gun and snatched the key during the robbery.

17. When presented with a printed copy of the U.S. Postal Inspection reward poster, **GREENE** circled himself and initialed next to the individual that he identified as himself. Then **GREENE** circled the second individual in the photo, identifying that individual as **UCC-1**. On or about July 20, 2026, during a second interview with **GREENE**, wherein he again waived his *Miranda* rights, I presented a photographic line-up to **GREENE**. Page three in the photo array contained a Maryland DMV photo of **UCC-1**. **GREENE** positively identified the individual depicted on page three as **UCC-1**. **GREENE** signed and marked the date next to the photograph of **UCC-1** and wrote **UCC-1's** name next to the photograph.

18. **GREENE** stated that he did not know the getaway driver's real name but knew him by the nickname "Mar". **GREENE** stated that Mar picked the area for the robbery. **GREENE** further stated that Mar did not own the Chevrolet Impala, but he believed that Mar obtained it from one of Mar's girlfriends. **GREENE** further stated that prior to the robbery, **UCC-1** stole a license plate from a car and placed it on the Chevrolet Impala. Investigators, referencing the photograph taken by V-1, searched the license plate number that was displayed on the Chevrolet Impala during the robbery. Investigators learned that the vehicle had been reported as stolen on or about November 4, 2025, in Randallstown, Maryland.

19. On or about August 5, 2026, I performed surveillance at an address in Baltimore, Maryland, listed as **UCC-1's** residential address on his Maryland driver's license. At approximately 1:33PM, I observed **UCC-1** exit from the residence.

20. On or about August 6th, 2026, I reviewed a Harford County Detention Center jail call (#98269848) between **GREENE** and his mother, which took place on or about July 24, 2026, at approximately 6:50PM. During the call, **GREENE** instructed his mother to access **GREENE's** cellphone and provide him with the phone number that **GREENE** used to communicate with **UCC-1**. **GREENE's** mother complied and provided **GREENE** with **UCC-1's** phone number ending in -6465.

<u>*SURVEILLANCE AND ARREST OF UCC-1*</u>

21. On or about August 28, 2026, a Virginia Magistrate authorized a search warrant for real-time location data for T-Mobile to provide investigators with real-time location data for **UCC-1's** telephone number ending in -6465. On the same date, a state arrest warrant was issued for **UCC-1** for the violations of Virginia Code Sections 18.2-58 (Robbery with a firearm) and 18.2-53.1 (Use of a firearm in committing a felony).

22. On or about August 26 through on or about September 2, 2026, I monitored **UCC-**

**1** using numerous methods of physical and electronic surveillance. I observed **UCC-1** operating a black 2026 Honda Civic ("Honda Civic"), bearing Massachusetts registration 6XBK44, on numerous occasions. Real-time location data associated with **UCC-1's** phone number also mirrored the movements of the Honda Civic. A records check on the Honda Civic's registration revealed that it was registered to EAN Holdings LLC (Enterprise Rent-A-Car) in Tulsa, Oklahoma.

23. On or about September 2, 2026, I located the Honda Civic, which was parked on the 2700 block of East Monument Street in Baltimore, Maryland. On that same date, the Honorable Kimberly Davis, Circuit Judge of the District Court of Maryland for Baltimore County, authorized a search warrant for the Honda Civic. At my request, Baltimore County Police initiated the towing of the vehicle to Baltimore County Police Headquarters pending the issuance of a search and seizure warrant. While the Honda Civic was in the process of being towed, **UCC-1** exited a nearby residence, approached two law enforcement officers, and asked why his car was being towed.

24. At that time, law enforcement placed **UCC-1** under arrest for the outstanding Virginia arrest warrant. Law enforcement searched **UCC-1's** person and recovered a wallet that contained multiple bank cards that bore different names.

<u>*THE SEARCH OF UCC-1'S CAR AND RESIDENCE*</u>

25. During the execution of the search warrant for the Honda Civic, law enforcement located a purse-type bag inside the trunk. From inside that bag, law enforcement located two cellphones (a white Apple iPhone and a blue Android phone) and ten (10) checks bearing different names. Some of the checks bore names that matched the bank cards recovered from **UCC-1's** wallet and addresses in the City of Fairfax, Virginia. Law enforcement also located gas-line antifreeze inside the trunk. I know, through training and experience, that individuals involved in check fraud use gas-line antifreeze to remove ink from checks for fraudulent purposes.

26. On or about August 26, 2026, the Honorable Wendy Epstein, Circuit Judge in the

State of Maryland, authorized a residential search warrant for **UCC-1's** residence in Baltimore, Maryland. On or about September 2, 2026, at approximately 12:44PM, investigators from the Baltimore County Police Department, USPIS, and the City of Fairfax Police Department executed the residential search warrant and searched **UCC-1's** bedroom.

27. Inside **UCC-1's** bedroom, investigators located the following items: a black and green semi-automatic SCCY 9mm pistol. **GREENE**, during his first interview with investigators, explained that **UCC-1** was known to carry a "Sky (sic) 9" pistol. Inside this bedroom, investigators also located a paper shredder that contained a pile of shredded checks. Inside the basement, investigators located a dresser that contained various blank check stock, which is used for printing checks, an extended magazine for a 9mm Glock pistol, and multiple license plates. Investigators conducted a DMV search for the registration numbers depicted on the license plates and learned that they were associated with vehicles that were previously registered to **UCC-1**.




*Photograph of handgun recovered from inside **UCC-1's** bedroom dresser*




*Photograph of shredded checks recovered from inside **UCC-1's** bedroom*



*Photograph of blank check stock found inside **UCC-1's** dresser*

*UCC-1 CONFESSED TO MAIL THEFT AND IDENTIFIED UCC-2*

28. On or about September 2, 2026, after executing a state arrest warrant for **UCC-1**, investigators conducted a recorded interview with **UCC-1** at the Baltimore County Police Department in Woodlawn, Maryland.

29. At the onset of the interview, investigators provided **UCC-1** with a *Miranda* rights advisal form. **UCC-1** signed the form and agreed to speak with investigators. **UCC-1** denied

involvement in the November 4, 2025, robbery, but admitted to conspiring with others to use stolen checks and fraudulent debit cards to illegally obtain U.S. currency. **UCC-1** admitted that the checks in his trunk and the debit cards found in his wallet were being used to fraudulently obtain U.S. currency. **UCC-1** stated that he picks up the cards and hands them to someone else and that person loads money onto the card. **UCC-1** admitted to owning the gun that was found in his bedroom dresser. **UCC-1** stated that he purchased the gun for $700.00 off the street, that he had shot the gun, and that his fingerprints will be on the gun. When discussing the check stock, **UCC-1** stated that he holds onto the check machine for the guy that prints the checks

30. Investigators asked **UCC-1** if he had ever been present when a blue box was hit. **UCC-1** responded that "I think I have been out there one time when it was hit" and "I guess it was in Fairfax" and "it was this year." Referring to that incident, **UCC-1** further stated that he woke up in the car and they were in Virginia. **UCC-1** continued and stated that we hit the box and we left. **UCC-1** further stated when they got to Virginia, he switched spots with the driver and then he drove.

31. **UCC-1** admitted to participating in schemes to illegally access USPS collection boxes with arrow keys. Investigators asked **UCC-1** whether he knows how much money has been stolen, to which he responded, "I just do my part." Investigators asked **UCC-1** how many times during the past six months had **UCC-1** participated in stealing mail from a USPS collection box to which **UCC-1** stated, "about four times." When asked about the specific locations he and his co-conspirators chose to target, **UCC-1** stated that he used the GPS on his phone to guide himself and others to zip codes that contained collection boxes that were accessible with the stolen arrow key. **UCC-1** further stated that they would "hit" a couple collection boxes each instance.

32. Towards the end of the interview, **UCC-1** identified **GREENE, UCC-2** and a third person as other individuals that law enforcement should investigate. **UCC-1** stated that **GREENE** grabs checks and "hits the boxes" and that **GREENE** was with him when they hit boxes.

33. **UCC-1** further stated that **GREENE, UCC-1,** and **UCC-2** each attended the same high school located in Baltimore County, Maryland. **UCC-1** denied being involved in the robbery that occurred on November 4, 2025, but stated that he is involved in check fraud and other criminal schemes to make money. **UCC-1** claimed that he has "clout" and acts as a recruiter for other people who want to be involved in various frauds.

*<u>UCC-2 & GREENE TRAVELED TO VIRGINIA ON DAY OF ROBBERY</u>*

34. On or about October 19, 2026, I reviewed Call Data Records ("CDRs") and Cell-Site Location Information ("CSLI") for telephone numbers associated with **UCC-2** (ending in -7674) and **GREENE** (ending in -1886), These records revealed cellular network activity at geographic locations that is consistent with both **UCC-2** and **GREENE** traveling together from Woodlawn, Maryland, to northern Virginia on the day of the robbery. At approximately 12:34 PM, cellular network activity for **UCC-2's** and **GREENE's** telephones was recorded at locations that were approximately 225 meters apart in Woodlawn, Maryland. At approximately 1:11 PM, cellular network activity for **UCC-2's** and **GREENE's** telephones was recorded near the American Legion Bridge, which connects Maryland and Virginia via Interstate 495. These associated locations are approximately 39 meters apart. At 1:12 PM, shortly after entering Virginia, **UCC-2's** phone recorded its last cellular network activity until approximately 4:18:PM that day.

35. Based on training and experience, I assessed the termination of cellular network activity to be consistent with **UCC-2** powering off his telephone, activating airplane mode on his telephone, or otherwise rendering his telephone unable to communicate with the cellular network. These tactics are used by those engaging in criminal activity to minimize law enforcement's ability

to trace patterns of movement through cellular activity.

36. Approximately fifteen (15) minutes prior to the robbery, at approximately 2:28 PM, **GREENE's** telephone generated cellular network activity associated with a location that is approximately 48 meters from the location of the robbery. In the minutes following the robbery, cellular network activity shows **GREENE's** phone departing Fairfax City and traveling towards Maryland.

37. At approximately 4:18 PM, **UCC-2's** phone reconnected to the cellular network at a location that is approximately 338 meters from **GREENE's** reported residence in Woodlawn, Maryland. Moreover, at approximately the same time, **UCC-2's** and **GREENE's** telephones generated cellular network activity records that are associated with locations that are approximately 27 meters apart. This sequence of cellular network activity is consistent with **GREENE's** statements about his presence at the robbery and **UCC-2** driving him there. Based on **GREENE's** interview and the timing and geographic proximity of the cellular network activity records, I believe **UCC-2** and **GREENE** traveled together to and from the robbery.

*(Continued on next page)*

## CONCLUSION

38. Based on the foregoing, I submit there is probable cause to believe that on or about June 19, 2026, within the Eastern District of Virginia, **GREENE** and others known or unknown, did knowingly and intentionally conspire, confederate, and agree with each other to assault a USPS mail carrier, a person having lawful charge, custody and control of United States mail matter, money, and other property of the United States, with the intent to rob, steal, and purloin said other property of the United States, namely a USPS arrow key, in violation of 18 U.S.C. §§ 111, 1704 ~~and~~ 2114(a), and 2.

Respectfully submitted,

Bradley Workman

Bradley Workman
Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to by telephone in accordance with Fed. R. Crim. Proc. 4.1 on November 10, 2026.

The Honorable William E. Fitzpatrick
United States Magistrate Judge